No. 22-55170

# In the United States Court of Appeals
# for the Ninth Circuit

_____

ROBERT ROMOFF and JOE SICILIANO,
on behalf of themselves and all others similarly situated,
*Plaintiffs-Appellants,*

v.

GENERAL MOTORS, LLC,
*Defendant-Appellee.*

_____

On Appeal from the United States District Court
for the Southern District of California

_____

## REPLY BRIEF OF PLAINTIFFS-APPELLANTS

_____

| | |
|---|---|
| **KALIELGOLD PLLC** | **CREED & GOWDY, P.A.** |
| Jeffrey D. Kaliel | Bryan S. Gowdy |
| Sophia Goren Gold | Florida Bar No. 0176631 |
| 1100 15th St. NW, 4th Floor | bgowdy@appellate-firm.com |
| Washington, D.C. 20005 | 865 May Street |
| | Jacksonville, Florida 32204 |
| **KOPELOWITZ OSTROW FERGUSON** | Telephone: (904) 350-0075 |
| **WEISELBERG GILBERT** | |
| Jason H. Alperstein | |
| Jeff Ostrow | |
| Jonathan M. Streisfeld | |
| 1 West Las Olas, Suite 500 | |
| Fort Lauderdale, Florida 33301 | |

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

Table of Contents ................................................................ i

Table of Authorities............................................................iii

Argument ........................................................................ 1

I.  The district court erred in dismissing the consumer protection
    claims. .................................................................... 2

    A. The district court's dictionary sense of the term Destination
       Charge was not based on a reasonable or average consumer's
       common sense or the context in which the term was used........ 2

    B. The AIDA is irrelevant because it does not preempt state laws ..
       ........................................................................10

    C. *McKell* is on point, and GM's cases are not persuasive data that
       the California Supreme Court would decide this case differently
       than the *McKell* court would.............................................11

       1. The district court disregarded *McKell*, and GM's attempts to
          undermine it are unavailing. ...........................................11

       2. GM's California cases are not persuasive data that the
          California Supreme Court would decide this case differently
          than the *McKell* court would...........................................15

          a. *Shvarts* ...................................................16

          b. *McCann* .................................................18

          c. *Wayne* ...................................................19

          d. Other Cases ...............................................20

II. The dismissal of all the claims was based on the same reasoning
    and thus this Court should reverse on all claims......................... 22

III.   GM's alternative arguments are meritless, and this Court could remand for the district court to consider them in the first instance. ................................................................................ 22

A. Plaintiffs plausibly alleged actual damages.........................23

B. Plaintiffs alleged the inadequacy of legal remedies. ..............25

Conclusion ....................................................................... 27

Statement of Related Cases................................................. 28

Certificate Of Compliance ................................................. 28

Certificate of Service......................................................... 29

# TABLE OF AUTHORITIES

**CASES**

*Barry v. Arrow Pontiac, Inc.*,
   494 A.2d 804 (N.J. 1985)....................................................5, 14

*Becerra v. Dr. Pepper/Seven Up, Inc.*,
   945 F.3d 1225 (9th Cir. 2019)..............................................9

*Berryman v. Merit Property Mgmt., Inc.*,
   152 Cal. App. 4th 1544, 62 Cal. Rptr. 177 (2007)...............20

*Bosland v. Warnock Dodge, Inc.*,
   964 A.2d 741 (N.J. 2009).......................................................24

*Brady v. Bayer Corp.*,
   26 Cal. App. 5th 1156, 237 Cal. Rptr. 3d 683 (2018)...........8

*Bruton v. Gerber Prod. Co.*,
   703 Fed. Appx 468 (9th Cir. 2017) ......................................14

*Byler v. Deluxe Corp.*,
   222 F. Supp. 3d 885 (S.D. Cal. 2016) ..................................23

*Cabell v. Markham*,
   148 F.2d 737 (2d Cir. 1945) ..................................................2

*Chapman v. Skype, Inc.*,
   220 Cal. App. 4th 217, 162 Cal. Rptr. 864 (2013)...........10-11

*Davidson v. Kimberly-Clark Corp.*,
   889 F.3d 956 (9th Cir. 2018)................................................27

*Douglas v. Noelle*,
   567 F.3d 1103 (9th Cir. 2009)..............................................23

*Erie R.R. Co. v. Tompkins*,
   304 U.S. 64 (1938) ..........................................................12, 22

*Ferry v. Porsche Cars N. Am., Inc.,*
  No. CV 21-5715-GW-ASX, 2022 WL 1769120 (C.D. Cal. Mar. 11,
  2022) ................................................................................................ 26

*Franklin v. Cmty. Reg'l Med. Ctr.,*
  998 F.3d 867 (9th Cir. 2021) .............................................................. 21

*Graham v. VCA Antech, Inc.,*
  No. 2:14-cv-08614-CAS-JC, 2016 WL 5958252 (C.D. Cal. Sept. 12,
  2016) ................................................................................................ 21

*Haas v. Travelex Ins. Servs. Inc.,*
  555 F. Supp. 3d 970 (C.D. Cal. 2021) ................................................ 26

*Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.,*
  62 Cal. 4th , 353 P.3d 319 (2015) ...................................................... 14

*Hassler v. Sovereign Bank,*
  644 F. Supp. 2d 509 (D.N.J. 2019) .................................................... 10

*Hinojos v. Kohl's Corp.,*
  718 F.3d 1098 (9th Cir. 2013) ............................................................ 24

*Jean v. Nelson,*
  472 U.S. 846 (1985) ........................................................................... 13

*Jeong v. Nexo Fin., LLC,*
  No. 21-cv-02392-BLF, 2022 WL 174236 (N.D. Cal. Jan. 19, 2022) .... 25

*Kwikset Corp. v. Superior Court,*
  51 Cal. 4th 310, 120 Cal. Rptr. 3d 741, 246 P.3d 877 (2011) ............. 24

*Lance v. McGreevey,*
  853 A.2d 856 (N.J. 2004) ..................................................................... 2

*Lavie v. Procter & Gamble Co.,*
  105 Cal. App. 4th 496, 129 Cal. Rptr. 2d 486 (2003) ........................... 5

*Leon v. Rite Aid Corp.,*
  774 A.2d 674 (N.J. Super. Ct. App. Div. 2001) .............................. 14, 22

*Lusnak v. Bank of Am., N.A.*,
  883 F.3d 1185 (9th Cir. 2018) ............................................................... 10

*MacKinnon v. Truck Ins. Exch.*,
  73 P.3d 1205 (Cal. 2003) ......................................................................... 2

*McCann v. Lucky Money, Inc.*,
  129 Cal. App. 4th 1382, 29 Cal. Rptr. 3d 437 (2005) ..................... 18-19

*McKell v. Washington Mutual, Inc.*,
  142 Cal. App. 4th 1457, 49 Cal. Rptr. 3d 227 (2006) .................. passim

*Miller v. Gammie*,
  335 F.3d 889 (9th Cir. 2003) ................................................................. 26

*Moore v. Mars Petcare US, Inc.*,
  966 F.3d 1007 (9th Cir. 2020) .......................................................... 7, 26

*Moore v. Trader Joe's Co.*,
  4 F.4th 874 (9th Cir. 2021) ..................................................................... 8

*Muniz v. United Parcel Serv., Inc.*,
  738 F.3d 214 (9th Cir. 2013) ................................................................. 11

*Nacarino v. Chobani, LLC*,
  No. 20-cv-07437-EMC, 2022 WL 344966 (N.D. Cal. Feb. 4, 2022) .........
  .................................................................................................... 25-26

*Sagastume v. Psychemedics Corp.*,
  No. CV 20-6624 DSF (GJSx), 2020 WL 8175597 (C.D. Cal. Nov. 30,
  2020) ..................................................................................................... 25

*Searle v. Wyndham International, Inc.*,
  102 Cal. App. 4th 1327 (2002) ........................................................ 20-21

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
  559 U.S. 393 (2010) .......................................................................... 12-13

*Shvarts v. Budget Group, Inc.*,
  81 Cal. App. 4th 1153, 97 Cal. Rptr. 2d 722 (2000) ........................ 16-17

*Sonner v. Premium Nutrition Corp.*,
   971 F.3d 834 (9th Cir. 2020).........................................................25-26

*Wayne v. Staples, Inc.*,
   135 Cal. App. 4th 466, 37 Cal. Rptr. 3d 544 (2006).......................19-20

*West v. Am. Tel. & Tel. Co.*,
   311 U.S. 223 (1940)...............................................................1, 15, 22

## STATUTES

15 U.S.C. § 1232........................................................................11

## RULES

Fed. R. App. P. 27(d)(2)(A) .........................................................28

Fed. R. App. P. 32(a)(5) ..............................................................28

Fed. R. App. P. 32(a)(6) ..............................................................28

Fed. R. App. P. 32(f)..................................................................28

## OTHER AUTHORITIES

Alex Leanse, *Destination Charges: What They Are and Why They Cost
   What They Do*, Motor Trend (Aug. 20, 2021),
   https://www.motortrend.com/features/what-are-car-destination-
   delivery-charges-fees/.........................................................4, 5

Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of
   Legal Texts* (2012) ................................................................2

Hearst Auto Research, *Dealership Fees: Everything You Need to Know*,
   Car and Driver,
   https://www.caranddriver.com/research/a31267777/dealer-
   fees/#:~:text=Dealership%20Fees&text=It%20is%20the%20cost%20of,
   However%2C%20others%20do%20not (last visited Sept. 6, 2022) ..4, 5

Renee Valdes, *Destination Charges and Dealer Fees Explained*, Auto
   Trader (Jan. 28, 2022, 4:00 PM), https://www.autotrader.com/car-
   tips/new-car-delivery-or-destination-charges-explained-213280..........3

*What are Destination Charges*?, Kelley Blue Book (Feb. 3, 2021, 12:00 PM), https://www.kbb.com/car-advice/what-are-destination-charges/ ............................................................................................................ 4

## ARGUMENT

This appeal is not about federal law or whether the panel believes the Destination Charge is deceptive. This appeal concerns whether *California's and New Jersey's high courts* would deem the Destination Charge actionable under those States' laws. In answering this question, this Court is constrained: it may not "disregard[]" the "considered judgment" of a State's intermediate court, "unless it is convinced by other persuasive data that the [State's] highest court . . . would decide otherwise." *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940).

Rather than follow the on-point *McKell* case,[1] GM instead relies (like the district court) on a dictionary definition of "charge" unmoored from the context in which that word is used here—a *Destination* Charge listed *separately* from the suggested *price*. Then, GM turns to an irrelevant federal law and red-herring arguments. When GM finally examines *McKell* and the other state cases, it does so erroneously. And GM's arguments based on the alternative grounds not addressed by the district court are meritless. This Court must reverse.

---

[1] *McKell v. Washington Mutual, Inc.*, 142 Cal. App. 4th 1457, 49 Cal. Rptr. 3d 227 (2006).

## I.   The district court erred in dismissing the consumer protection claims.

### A.   The district court's dictionary sense of the term Destination Charge was not based on a reasonable or average consumer's common sense or the context in which the term was used.

The district court erred when it relied on an online dictionary and its own "common sense" to find that no reasonable or average consumer would understand the term Destination Charge to signify an "absence of profit." ER-18; *see* Red 11, 22, 24–26, 28, 32–34, 39, 42, 43–44.   The California and New Jersey Supreme Courts have heeded Judge Learned Hand's admonition "not to make a fortress out of the dictionary." *Lance v. McGreevey*, 853 A.2d 856, 860 (N.J. 2004) (quoting *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945)); *accord MacKinnon v. Truck Ins. Exch.*, 73 P.3d 1205, 1214 (Cal. 2003). A dictionary does "not necessarily yield the 'ordinary and popular' sense of the word" if it "disregards" the "context" in which the word is used. *MacKinnon*, 73 P.3d at 1214; *see also* Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 418 (2012) ("A dictionary definition states the core meanings of a term. It cannot delineate the periphery.").

The district court's reliance on an online dictionary disregarded the context in which the word "charge" was used here; that reliance thus was

2

not an exercise of "common sense." A true common-sense analysis would have considered the context—a *Destination* Charge for an *auto* sale listed *separately* from the manufacturer's suggested retail *price* (MSRP). No consumer exercising common sense would say, "I will review Merriam Webster's dictionary to understand the meaning of the Destination Charge on the auto sticker."

A far more likely scenario is that a reasonable or average consumer would consult online publications to learn about the Destination Charge. Such a consumer would learn from Auto Trader that a Destination Charge covers the *cost*s of delivering a vehicle to the dealership:

> What is a Destination Charge?
>
> A destination charge, often called a freight fee or freight delivery charge, ensures that new car buyers pay equally to cover the cost of delivering a vehicle to a dealership.
> ….
> A destination charge is essentially a car's delivery fee to the dealership. The dealership must pay an amount for the vehicles to be delivered to their lots. In turn, the dealership makes the customer cover that cost with the destination charge.

Renee Valdes, *Destination Charges and Dealer Fees Explained*, Auto Trader (Jan. 28, 2022, 4:00 PM), https://www.autotrader.com/car-tips/new-car-delivery-or-destination-charges-explained-213280.           A

consumer would learn from Kelley Blue Book that "destination fees get based on direct costs" that "are above and beyond the overhead companies must incur in bringing a product to market." *What are Destination Charges*?, Kelley Blue Book (Feb. 3, 2021, 12:00 PM), https://www.kbb.com/car-advice/what-are-destination-charges/.

While the district court believed "[t]he term 'Destination Charge' does not reasonably imply an absence of profit," ER-18, a consumer would learn the exact opposite from Motor Trend: "[C]harging destination fees *isn't really part of [the car dealers'] profit strategy.* . . . [Dealers] pay it to get a car on their lot, so they pass it on to customers—simply recouping an expenditure." Alex Leanse, *Destination Charges: What They Are and Why They Cost What They Do*, Motor Trend (Aug. 20, 2021) (emphasis added), https://www.motortrend.com/features/what-are-car-destination-delivery-charges-fees/. Similarly, Car and Driver would tell the consumer that a "[d]estination fee . . . is the cost of the manufacturer bringing the car to the dealer . . . ." Hearst Auto Research, *Dealership Fees: Everything You Need to Know*, Car and Driver, https://www.caranddriver.com/research/a31267777/dealer-fees/#:~:text=Dealership%20Fees&text=It%20is%20the%20cost%20of,However%2C%20others%20do%20not (last visited Sept. 6, 2022).

Granted, perhaps sophisticated consumers will research and learn that GM's Destination Charge includes profits. But the question is whether the charge is likely to deceive a *reasonable or average* consumer, Blue 11, "not whether it can later be explained to the *more knowledgeable, inquisitive consumer*." *Barry v. Arrow Pontiac, Inc.*, 494 A.2d 804, 810 (N.J. 1985) (emphasis added); *see also Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 129 Cal. Rptr. 2d 486, 496 (2003) ("[A] 'reasonable consumer' need not be 'exceptionally acute and sophisticated.'").

According to GM, however, a reasonable or average consumer could negotiate the Destination Charge as part of a vehicle's "total sticker price." Red 20. But as GM concedes (Red 15), Plaintiffs allege the Destination Charge is *not* negotiable. ER-103–04, ¶ 4 ("GM . . . require[s] that the specific amount of the Destination Charge be passed through to consumers, who *are not allowed to negotiate* the amount as part of the Class Vehicle's overall price.") (emphasis added); *see also* Leanse, *supra* ("[I]t's uncommon for a dealer to waive or negotiate on a destination fee."); Hearst Auto Research, *supra* ("[The] [d]estination fee . . . you likely cannot lower.")

As GM further concedes, the total sticker price—which includes the Destination Charge and two other components—is the "starting point in negotiations." Red 20. In negotiating for a vehicle, a reasonable or average consumer is likely to be deceived if he misunderstands one of the three components of the "starting point" to be a non-negotiable pass-through cost rather than what it actually is—a non-negotiable source of profits for the manufacturer.

GM also contends that "[t]he destination charge, as part of the manufacturer's sticker price for a vehicle, is fundamentally different from taxes or other add-on charges." Red 30. But the only "fundamental difference" between the Destination Charge and some other add-on charges is that federal law mandates its prominent disclosure—a mandate that exists to protect consumers. In any event, the Destination Charge's characterization—as an add-on or something else—is irrelevant. However it is characterized, the Destination Charge establishes a deceptive "starting point" (Red 20) for the negotiations by suggesting it pays for a cost, rather than for GM's profit.

GM's "common sense" cases (Red 22, 25) favor Plaintiffs. In one case, purchasers of "prescription" pet food alleged the manufacturers and

others violated the UCL and CLRA by requiring pet owners to obtain a veterinarian's prescription to buy pet food—that lacked any controlled substances—at a higher price than comparable food. *See Moore v. Mars Petcare US, Inc.,* 966 F.3d 1007, 1012-13 (9th Cir. 2020) (Red 22, 25, 26, 42). This Court applied common sense and a dictionary definition of "prescription" to find the labels were likely to deceive reasonable consumers into believing the pet foods contained a controlled substance. *Id.* at 1018. Unlike the district court here, the Court considered the word "prescription" in its proper context: as a component of a marketing scheme that allegedly used the trappings of veterinary medicine to deceive consumers into spending more on pet food than they otherwise would have. *Id.* Here, the Destination Charge is disclosed with the vehicle's price components. In this context, a reasonable or average consumer would expect each line-item to accurately represent what it purports to represent (a *Destination* Charge)—just as a reasonable or average consumer would expect a "prescription" pet food to contain a controlled substance.

In another GM case, the court allowed "to proceed beyond the pleading stage" a claim alleging a "One A Day" supplement violated the

UCL and CLRA because the tradename conflicted with a label instructing the taking of two supplements daily. *See Brady v. Bayer Corp.*, 26 Cal. App. 5th 1156, 237 Cal. Rptr. 3d 683, 686, 695–96 (2018) (Red 22). As a matter of common sense, the court concluded that a reasonable consumer would expect such a product to require only one daily supplement to achieve the desired nutritional benefits. *Id.* The court rejected the defendant's argument that a reasonable consumer would base his purchasing decision on the label. *Id.* at 689. The defendant's argument there, like GM's argument here, overstated the sophistication of a reasonable or average consumer. *See id.* at 698 (rejecting "the assumption that reasonable consumers of vitamins are back-label scrutinizers").

GM's dictionary cases don't help GM. For instance, in one such case, this Court concluded that a "Manuka Honey" product was not deceptively labeled though it only partially consisted of honey derived from Manuka nectar. *See Moore v. Trader Joe's Co.*, 4 F.4th 874, 876 (9th Cir. 2021) (Red 25). The Court relied on, among other things, FDA guidelines permitting honey to be labeled by its "*chief* floral source," and it used a dictionary to interpret the word "chief." *Id.* at 881 & n.8 (emphasis

added). In contrast, here, the district court did not use a dictionary to interpret a *written law* (like the FDA guidelines or the AIDA), but rather to interpret whether *a label was deceptive to reasonable or average consumers.* Again, no reasonable or average consumer would consult Merriam Webster's dictionary to learn the meaning of Destination Charge on an auto sticker.

GM's next dictionary case, *Becerra v. Dr. Pepper/Seven Up, Inc.*, 945 F.3d 1225 (9th Cir. 2019) (Red 24–25), proves that context matters and that dictionaries are not the be-all-end-all solution for finding the expectations of a reasonable consumer. Just as GM and the district court here myopically focus on the word "charge" and its dictionary meaning rather than on the context (*Destination* Charge), the *Becerra* plaintiff myopically focused on the word "diet" and its dictionary meaning rather than the context (Diet *Dr. Pepper*). This Court rejected the plaintiff's out-of-context reading of the word "diet." *Id.* at 1229 ("When considering the term in its proper context, no reasonable consumer would assume that Diet Dr Pepper's use of the term 'diet' promises weight loss or management."). Similarly, here, when considering the term "charge" in its proper context—a *Destination* Charge next to a separate listing for

the auto's suggested retail *price* (MSRP)—no reasonable consumer would assume GM uses the term Destination Charge to signify profit. *See also Hassler v. Sovereign Bank*, 644 F. Supp. 2d 509, 516 (D.N.J. 2019) (Red 25) (rejecting "out of context" reading that was plausible only "if the sentences immediately preceding it are ignored entirely").

## B. The AIDA is irrelevant because it does not preempt state laws.

The AIDA is irrelevant, notwithstanding GM's extensive reliance on it. Red 12–13, 19–20, 26–30, 33, 56. The AIDA would be relevant only if it preempted California's and New Jersey's laws. GM does not argue preemption; thus, the state laws are not preempted. *Cf. Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1191 (9th Cir. 2018) (assuming "the State's historic police powers are not preempted").

GM's compliance with the *AIDA's* "amount charged" requirement (Red 26) does not mean that GM complied with *California's and New Jersey's* non-preempted consumer protection laws (Blue 42). Nor does the fact that GM literally stated the correct amount of the Destination Charge mean GM complied with those state laws. Blue 11, 19–20; *see also Chapman v. Skype, Inc.*, 220 Cal. App. 4th 217, 162 Cal. Rptr. 864, 871

(2013) (UCL prohibits literally true advertising that is "misleading" or has a "capacity . . . to deceive or confuse the public").

GM's compliance with the state laws will not require GM to violate the AIDA or its separate-line-item requirement. *Cf.* Red 29. Nothing in the AIDA requires GM to include a substantial profit in its Destination Charge. *See* 15 U.S.C. § 1232; Blue 42. That misleading practice is compelled by GM's own free will—not by any law. Federal law neither compels nor authorizes the practice, and state law, Plaintiffs allege, prohibits the practice. The federal and state laws are thus compatible, not contradictory.

### C. *McKell* is on point, and GM's cases are not persuasive data that the California Supreme Court would decide this case differently than the *McKell* court would.

#### 1. The district court disregarded *McKell*, and GM's attempts to undermine it are unavailing.

GM faults Plaintiffs for "almost exclusively bas[ing] their appeal on *McKell*," contending that Plaintiffs "vastly overstate [its] precedential effect." Red 35. But, as GM's cited case states, a federal court "should . . . follow a published intermediate state court decision regarding [state] law unless [it] is convinced that the [state] [s]upreme [c]ourt would reject it." *Muniz v. United Parcel Serv., Inc.*, 738 F.3d 214, 219 (9th Cir. 2013) (Red

35). Contrary to this command, the district court here neither followed *McKell* nor explained why the California Supreme Court would reject it. Blue 24.

GM's attempt to distinguish *McKell*—because it purportedly involved "add-on costs" (Red 36–38)—is unpersuasive. This distinction, even if true, is immaterial here. GM concedes that the Destination Charge is part of the total sticker price, which, it further concedes, is the "starting point in negotiations." Red 20. A reasonable or average consumer is likely to be deceived if he misunderstands a component of this "starting point"—whether labeled an "add-on" or something else—to be a non-negotiable pass-through cost rather than a non-negotiable source of profits for the manufacturer. *Supra* at 6.

Equally unpersuasive is GM's plea that this Court disregard *McKell* because of "the different pleading standards in federal and state court." Red 42–43. Different pleading standards do not liberate a federal court from *Erie*'s[2] constitutional command that it must defer to state courts on questions of state law. *Cf. Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 406 (2010) ("*Erie* involved the

---

[2] *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

constitutional power of federal courts to supplant state law with judge-made rules."). Five justices have cautioned federal courts to interpret the federal rules "with sensitivity to important state interests." *Id.* at 442 (Ginsburg, J., dissenting, joined by Justices Kennedy, Breyer, and Alito); *id.* at 421 n.5 (Stevens, J., concurring in part and concurring in the judgment). This Court need not decide any constitutional questions—such as whether different procedural rules may lead to different outcomes in different forums—because GM has failed to argue, much less show, that Plaintiffs' complaint is insufficient under the federal pleading rules. *See Jean v. Nelson*, 472 U.S. 846, 854 (1985) ("Prior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision.")

*McKell*'s on-point reasoning also applies to Plaintiffs' CLRA and unjust enrichment claims, contrary to what GM suggests (Red 44). *McKell* ruled the CLRA did not apply to the real-estate transaction there because it was not for "the sale or lease of *goods* or *services*." Blue 21 n.1. In contrast, the transaction here involves the sale of a good—a vehicle. ER-103, ¶1. Thus, the CLRA applies, and *McKell*'s UCL reasoning applies equally to the CLRA claims. *See* Blue 16 (CLRA and UCL both

apply the "likely to be deceived" test). Insofar as *McKell* did not recognize an unjust enrichment claim, 49 Cal. Rptr. 3d at 254, the California Supreme Court has since recognized such a claim. *See Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.*, 62 Cal. 4th 988, 353 P.3d 319, 326 (2015); *see also Bruton v. Gerber Prod. Co.*, 703 Fed. Appx 468, 470 (9th Cir. 2017) (unpublished) (*Hartford* clarified unjust enrichment law).

GM is right about one thing—*McKell* is not a New Jersey case. Red 44. But Plaintiffs' opening brief showed that *McKell* was "consistent with caselaw applying New Jersey's Act." Blue 24; *accord id.* 11. In response, GM makes meaningless distinctions. Red 44–45. To distance itself from the New Jersey Supreme Court's *Barry* case, 494 A.2d at 804, GM touts its AIDA compliance. Red. 45. But compliance with federal law does not equate to compliance with New Jersey law. Federal law does not condone the deceptive up-charging at issue here. *See supra* ¶ I.B, at 10–11. And GM incorrectly distinguishes *Leon v. Rite Aid Corp.*, 774 A.2d 674 (N.J. Super. Ct. App. Div. 2001), on the ground there is no "allegation of [GM] secretly charging more." Red 45 n.7. In fact, Plaintiffs alleged: "GM actively concealed—and continues to conceal—the true nature of its Destination Charge and knowingly made misrepresentations about the

14

nature of the Destination Charge." ER-109, ¶ 39.

Finally, GM asserts two other California cases Plaintiffs cited are "not on point." Red 41 n. 6. But Plaintiffs never said they were. Plaintiffs said they were "consistent" with, and "similar" to, *McKell*. Blue 11, 23. The question before this Court is whether other California cases serve as "persuasive data" that California's highest court would not follow *McKell*. *See West*, 311 U.S. at 237. GM cites several cases that, it claims, undermine *McKell*. Red 38–41. But these cases miss the mark and leave *McKell* intact.

### 2. GM's California cases are not persuasive data that the California Supreme Court would decide this case differently than the *McKell* court would.

To save the district court from its faulty reasoning that ignored *McKell*, GM argues that Plaintiffs' "reading of *McKell* would necessarily conflict with other" California decisions, "none of which [are] mentioned in Plaintiffs' opening brief." Red. 38. But the district court also did not mention these decisions, ER-11–21, showing it failed to appreciate its role was to predict how the States' high courts would apply their States' laws. In any event, GM's cases neither undermine *McKell* nor serve as

persuasive data that the California Supreme Court would decide this case differently than the *McKell* court would.

### a. *Shvarts*

In GM's first case (Red 38–39), the court rejected UCL and CLRA claims that alleged a car rental company charged refueling fees above market costs when renters returned cars without full tanks. *See Shvarts v. Budget Group, Inc.*, 81 Cal. App. 4th 1153, 1155-56, 97 Cal. Rptr. 2d 722 (2000). Unlike the consumers here, the *Shvarts* consumers did not allege that the charge deceived consumers to reasonably believe they were paying a cost rather than a profit. Instead, the *Shvarts* consumers merely alleged the fees were "excessive." *Id.* at 1156. The court concluded the "public [was not] likely to be deceived" because the allegedly excessive amount, $3.58 per gallon, was "clearly printed on the first page of the rental agreement." *Id.* at 1160. In other words, a rental car consumer would know the market cost of gasoline was less than $3.58 per gallon and could not have been deceived when the defendant explicitly disclosed it was charging $3.58 per gallon. *See id.*

Unlike consumers who would know how much gasoline costs at the pump, the consumers here "are at an informational disadvantage"

because "[GM] knows what it costs to ship its vehicles to their destination, while consumers do not." Blue 5 (citing ER-108, ¶31.) And GM's failure to disclose "the profit-based nature of its Destination Charge" (Blue 5 (citing ER-109, ¶35)) puts consumers at a disadvantage for the "starting point in negotiations." *Supra* at 5–6. Similar to the consumers here and dissimilar to the *Shvarts* consumers, the *McKell* consumers likely were deceived when they were charged "more for services than the actual cost of those services, with no indication" that they were being so charged because the consumers "likely would believe that fees charged in connection with a home mortgage loan bore some correlation to services rendered." 49 Cal. Rptr. 3d at 240; Blue 21.

In sum, a reasonable or average consumer knows the market costs of a gallon of gasoline and is not deceived when he signs a contract explicitly stating the above-market amount he will pay. *See Shvarts*, 81 Cal. App. 4th at 1160. But a reasonable or average consumer does not know the costs for a manufacturer to deliver a vehicle to a dealer or the costs of services for a home mortgage loan. Thus, unlike *Shvarts*' rental car consumers, the consumers here and in *McKell* are likely deceived when the defendants conceal the profit-based nature of their charges.

17

## b. *McCann*

In GM's second case (Red 39), the court rejected a claim alleging that a foreign currency exchange company violated the UCL by failing to disclose it was charging customers a higher exchange rate than the one it paid to its wholesalers. *See McCann v. Lucky Money, Inc.*,129 Cal. App. 4th 1382, 29 Cal. Rptr. 3d 437, 439-40 (2005). California's comprehensive regulatory scheme of foreign currency exchanges was a critical aspect of the court's reasoning. *See id.* at 441–42, 444–49. State banking regulators had long known of the practices at issue and had never interpreted the relevant statutes to prohibit the defendant's conduct. *Id.* at 445-46. In particular, the court concluded that because the defendant's practice complied with this regulatory scheme, the practice was not actionable under the UCL. *Id.* at 448–49. Unlike the practice in *McCann*, the Destination Charge here and the mortgage services charges in *McKell* are not the subject of extensive state regulation.

Additionally, unlike here and *McKell*, *McCann* involved profits generated from the very services the defendant was in the business of selling: exchanging currency. A reasonable or average consumer would expect that a currency exchange company could not stay in business

unless it charged customers a higher rate than the one it pays to its wholesalers. In contrast, a reasonable or average consumer would not expect that a car manufacturer would go out of business unless its charge for delivering vehicles exceeded its actual costs. Simply put, unlike here, there was no reasonable expectation in *McCann* of a mere pass-through charge.

### c. *Wayne*

In GM's third case (Red 39–40), the court concluded that Staples was entitled to summary judgment on claims that it violated the CLRA by allegedly failing to disclose that its shipping insurance charges included a markup. *See Wayne v. Staples, Inc.*, 135 Cal. App. 4th 466, 37 Cal. Rptr. 3d 544, 549 (2006). There, Staples' form advised its customers that the insurance was "provided through the carrier (that is, UPS), not Staples" and that Staples "may surcharge the cost of this product as an administrative expense, for services such as processing of potential claims and related services." *Id.* The court found no CLRA violation because of the form's clear disclosures. *Id.* at 557-58. If GM here had made a similar disclosure—for example, "GM may surcharge the cost of delivering this vehicle to dealer to increase its profit"—then *Wayne* would

be relevant. But GM made no such disclosure, and thus *Wayne* is irrelevant.

### d. Other Cases

GM's other cases also do not show that the California Supreme Court would decide this case differently than the *McKell* court would:

- In *Berryman v. Merit Property Management, Inc.*, 152 Cal. App. 4th 1544, 62 Cal. Rptr. 177 (2007) (Red 40), the court rejected UCL claims that a property management company charged homeowners excessive fees in residential real estate transactions.[3] *Id.* at 187-88. Excessive fees—by themselves—are not actionable. But, as *Berryman* acknowledges, "affirmative misrepresentations" are actionable. *Id.* at 188. Calling a profit charge a *Destination* Charge is an actionable, misleading representation.

- In *Searle v. Wyndham International, Inc.*, the court rejected UCL claims alleging a hotel's surcharge was deceptive because it included an undisclosed gratuity to the server. 102 Cal. App. 4th

---

[3] *Berryman* also rejected CLRA claims for reasons not germane here—"the CLRA does not include transactions such as obtaining documents and transferring title." 62 Cal. Rptr. at 189.

1327, 1330-31 (2002) (Red 40). The court reasoned "how and what a hotel pays its room service servers is a matter between the hotel and the servers." *Id.* at 1330, 1335. The court's observation—that "[t]he hotel is free to retain for itself the large premium, as well as the service charge"—was dicta. Unlike here, the complaint did not allege that the hotel deceptively pocketed the surcharge as profit, but rather that the hotel deceptively used the surcharge to compensate servers. *Id.* at 1334-35.

- *Graham v. VCA Antech, Inc.*, No. 2:14-cv-08614-CAS-JC, 2016 WL 5958252 (C.D. Cal. Sept. 12, 2016) (Red 40–41), is irrelevant because "the opinions of other federal district judges on a question of state law do not constitute convincing evidence that the state supreme court would decide an issue differently." *Franklin v. Cmty. Reg'l Med. Ctr.*, 998 F.3d 867, 874 n. 9 (9th Cir. 2021) (internal alterations and quotations omitted).

\*\*\*\*\*

In summary, *McKell* is on point here. California and New Jersey caselaw is consistent with *McKell*. No California case persuasively shows that the California Supreme Court would decide the California claims

differently than the *McKell* court would, and thus this Court must follow *McKell* on those claims. *See West*, 311 U.S. at 237. Based on the New Jersey cases, this Court's best *Erie* guess is that the New Jersey Supreme Court would likewise follow *McKell*. *Cf. Leon*, 774 A.2d at 677 ("[T]he history of the [New Jersey] Act is one of constant expansion of consumer protection."). And neither Merriam-Webster's dictionary, nor the AIDA, nor any other GM argument should cause this Court to disregard *McKell*. It should reverse the district court.

## II. The dismissal of all the claims was based on the same reasoning and thus this Court should reverse on all claims.

GM is correct that Plaintiffs' UCL and unjust enrichment claims were predicated on the same conduct. Red 46. In fact, the district court's reasoning for dismissing the UCL, CLRA, unjust enrichment, and New Jersey CFA claims was coterminous. Blue 8–9. Thus, this Court should reverse the dismissal of all these claims. Blue 34–35, 50–51

## III. GM's alternative arguments are meritless, and this Court could remand for the district court to consider them in the first instance.

GM advances two alternative grounds not reached by the district court. Specifically, Plaintiffs purportedly did not plausibly allege: (1) any damages and (2) the absence of adequate legal remedies as to the

equitable claims. Red 47–55. This Court should reject both grounds. Alternatively, because the district court did not consider these grounds, this Court may remand for the district court to consider them in the first instance. *See Douglas v. Noelle*, 567 F.3d 1103, 1109 (9th Cir. 2009) ("We generally do not consider an issue not passed upon below.")

### A. Plaintiffs plausibly alleged actual damages.

Contrary to GM's argument (Red 47–48), Plaintiffs alleged they were overcharged. Plaintiffs' complaint shows an overcharge by comparing GM's Destination Charge to transportation fees charged by GM's competitors. GM's Destination Charge has grown by a much greater rate than those of its competitors in recent years. *See* ER-107–08, ¶¶28–30. One court has approved a similar methodology to demonstrate an overcharge in a UCL claim. *See Byler v. Deluxe Corp.*, 222 F. Supp. 3d 885, 891, 899-900 (S.D. Cal. 2016) (plaintiffs alleged an overcharge by comparing the price they paid to the price charged for the same product on other websites).

Plaintiffs suffered an injury because they paid more for their vehicles than they would have paid but for GM deceptively including

profit in the Destination Charge. As the California Supreme Court has explained:

> [B]ecause of the misrepresentation[,] the consumer . . . was made to part with more money than he or she otherwise would have been willing to expend, i.e., that the consumer paid more than he or she actually valued the product. *That increment, the extra money paid, is economic injury* and affords the consumer standing to sue.

*Kwikset Corp. v. Superior Court,* 51 Cal. 4th 310, 120 Cal. Rptr. 3d 741, 246 P.3d 877, 890–91 (2011) (emphasis added). What's more, this Court has rejected GM's benefit-of-the-bargain argument. *See Hinojos v. Kohl's Corp.,* 718 F.3d 1098, 1107 (9th Cir. 2013) (holding that a "benefit of the bargain" defense may only be used where an allegedly problematic misrepresentation is not material). And New Jersey's bar for demonstrating economic injury is even lower than what California requires. *See Bosland v. Warnock Dodge, Inc.,* 964 A.2d 741, 750 (N.J. 2009) ("The CFA does not demand that a plaintiff necessarily point to an actually suffered loss or to an incurred loss, but only to one that is 'ascertainable.'"). Thus, this first alternative ground is not a basis to affirm.

**B.     Plaintiffs alleged the inadequacy of legal remedies.**

Citing *Sonner v. Premium Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020), GM argues that Plaintiffs failed to allege the inadequacy of legal remedies as to their claims for equitable relief. Red 51–55. In *Sonner*, this Court affirmed the dismissal of UCL and CLRA claims seeking equitable relief after the plaintiff "strategically" amended her complaint on the eve of trial to drop her damages claim. *Id.* at 844-45.

Several district courts have concluded *Sonner* does not apply at the pleading stage, given its unique facts and the general liberal policy of allowing alternative pleading. *See Jeong v. Nexo Fin., LLC*, No. 21-cv-02392-BLF, 2022 WL 174236, at *27 (N.D. Cal. Jan. 19, 2022) (declining to dismiss equitable claim because the court "may reassess [that claim] at a later stage of the case"); *Sagastume v. Psychemedics Corp.*, No. CV 20-6624 DSF (GJSx), 2020 WL 8175597, at *7 (C.D. Cal. Nov. 30, 2020) ("*Sonner* does not hold that plaintiffs may not seek alternative remedies at the pleading stage."); *Nacarino v. Chobani, LLC*, No. 20-cv-07437-EMC, 2022 WL 344966, at *9 (N.D. Cal. Feb. 4, 2022) (declining to dismiss restitution claim at the pleading stage, as *Sonner* merely "teaches that a plaintiff, on the eve of trial, cannot create an inadequacy

of a legal remedy by eliminating its availability by taking volitional action."). *Sonner* is also inapposite to Plaintiffs' claims for injunctive relief, as prospective harms necessarily lack an adequate legal remedy. *See Haas v. Travelex Ins. Servs. Inc.*, 555 F. Supp. 3d 970, 976 (C.D. Cal. 2021) (holding that the allegation of prospective harm demonstrates the inadequacy of a legal remedy).

GM's reading of *Sonner* is untenable because it conflicts with this Court's earlier decision in *Moore*, 966 F.3d at 1007. In *Moore*, the Court decided that the defendants' argument—"[p]laintiffs cannot seek equitable relief under the UCL . . . given an adequate legal remedy under the CLRA"—was "foreclosed by statute." *Id.* at 1021 n.13. Specifically, "[t]he UCL . . . and CLRA explicitly provide that remedies under each act are cumulative to each other." *Id.* Because a later panel may not overturn an earlier panel's decision, this panel must follow *Moore* insofar as it conflicts with *Sonner. See Ferry v. Porsche Cars N. Am., Inc.,* No. CV 21-5715-GW-ASX, 2022 WL 1769120, at *5 & n.6 (C.D. Cal. Mar. 11, 2022) (citing *Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (en banc)) (following *Moore* instead of *Sonner* because the former decision was issued earlier). This Court thus should decline GM's invitation to create

26

a conflict between its precedents and instead should allow Plaintiffs to proceed with their equitable claims.

Finally, this Court also should reject GM's assertion that Plaintiff Romoff cannot plausibly claim a threat of future injury. Red 55. A previously deceived consumer, like Mr. Romoff, has "standing to seek an injunction against false advertising or labeling, even though [he] now knows or suspects that the advertising was false at the time of the original purchase." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969 (9th Cir. 2018). Moreover, the threat of future harm is a factual issue, the resolution of which requires a more developed record. *See* ER-115, ¶ 68 ("Defendant . . . continues to injure the public by misleading consumers about its fees.") At this early juncture, affirming the denial of Plaintiff Romoff's claim on this basis would be premature.

## <u>CONCLUSION</u>

This Court should reverse as more fully stated in the opening brief. Blue 51. This Court should reject GM's alternative arguments not considered by the district court (Red 47–55), or alternatively, remand for the district court to consider them in the first instance.

CREED & GOWDY, P.A.

/s/ *Bryan S. Gowdy*

27

**Bryan S. Gowdy**
Florida Bar No. 0176631
bgowdy@appellate-firm.com
filings@appellate-firm.com
865 May Street
Jacksonville, Florida 32204
Telephone: (904) 350-0075
*Counsel for Plaintiffs-Appellants*


## STATEMENT OF RELATED CASES

**9th Cir. Case Number** 22-55170

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

By: */s/ Bryan S. Gowdy*


## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that this motion complies with the type-volume limitation of Rule 27(d)(2)(A), Federal Rules of Appellate Procedure, in that it contains <u>5446</u> words (including words in footnotes), excluding the parts of the document exempted by Fed. R. App. P. 32(f), according to the word-processing system used to prepare this motion. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6)

because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

By: */s/ Bryan S. Gowdy*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 06, 2022, I electronically filed the foregoing brief with the Clerk of Court of the U.S. Court of Appeals for the Ninth Circuit using the CM/ECF system. All participants are registered and will be served by the CM/ECF system.

By: */s/ Bryan S. Gowdy*